IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LORI MARTIN,                          §
                                      §
                    Plaintiff,        §
                                      §
v.                                    §      Civil Action No. 3:07-CV-1663-O
                                      §
UT SOUTHWESTERN MEDICAL               §
CENTER,                               §
                                      §
                    Defendant.        §

**MEMORANDUM OPINION AND ORDER**

Before the court are Defendant UT Southwestern's Motion for Summary Judgment, filed

November 3, 2008 (Doc. #32), and Defendant's Motion to Strike Plaintiff's Summary Judgment

Evidence and Brief in Support, filed December 16, 2008 (Doc. # 47). After careful consideration

of the motions, responses, reply[1], summary judgment evidence, record and applicable law, the court

**grants in part and denies in part** Defendant UT Southwestern's Motion for Summary Judgment

and **denies as moot** Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence and Brief

in Support.

I.      **Factual and Procedural Background**

This employment discrimination case arises out of Plaintiff Lori Martin's temporary

employment with Defendant UT Southwestern Medical Center ("Defendant" or "UT Southwestern")

from May 5, 2006 to July 19, 2006. Plaintiff Lori Martin ("Plaintiff" or "Martin") filed this case

on September 28, 2007, claiming sexual harassment and subsequent retaliation after she reported

_____

[1]Defendant filed a reply to Plaintiff's opposition to its summary judgment motion, but not a reply to Plaintiff's
response to its motion to strike.

1

the harassment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*("Title VII") and the Texas Commission on Human Rights Act, Tex. Lab. Code Ann. § 21.001 *et seq*. ("TCHRA").[2] UT Southwestern has filed a motion for summary judgment contending that Plaintiff lacks standing to bring this employment discrimination suit since UT Southwestern was not her employer for purposes of Title VII and the TCHRA. Alternatively, UT Southwestern contends it is entitled to summary judgment on Martin's sexual harassment claims since: (i) Martin cannot establish a *prima facie* case of sexual harassment; and (ii) Martin unreasonably failed to take advantage of UT Southwestern's sexual harassment policy and the corrective action offered under it. As to Martin's retaliation claims, UT Southwestern argues it is entitled to summary judgment since Martin cannot establish that UT Southwestern's legitimate, nondiscriminatory reason for terminating her contract was a pretext for retaliation.[3] The court now sets forth the facts upon which it relies to resolve UT Southwestern's summary judgment motion. In setting forth the facts, the court applies the summary judgment standard set forth in the following section. *See* infra Section II.

Plaintiff worked as a registered nurse at the Simmons Cancer Center Oncology Clinic at UT Southwestern from May 5, 2006, until UT Southwestern terminated her services on July 19, 2006. Def. App. 150. UT Southwestern retained Martin through The Quest Group ("Quest"), a temporary staffing agency, under a contract which was to last 12 or 13 weeks. *Id.* at 148. Prior to being hired,

---

[2]Plaintiff originally alleged causes of action under 42 U.S.C. §§ 1981 and 1983, which Defendant moved to dismiss based on UT Southwestern's Eleventh Amendment immunity. Following a hearing, the court granted Defendant's motion to dismiss. *See* Docket # 27.

[3]Defendant has also moved for summary judgment on Plaintiff's claim for punitive damages, arguing that UT Southwestern has sovereign immunity from this claim. In her response, Plaintiff concedes that a dismissal of her punitive damages claim is appropriate in light of Defendant's sovereign immunity. *See* Pl. Opp'n to Def. MSJ at 3. Accordingly, the court **grants** Defendant's motion for summary judgment as to Plaintiff's claim for punitive damages.

Quest provided Martin's *curriculum vitae* to UT Southwestern, after which Rita Powell ("Powell"), UT Southwestern's nursing supervisor, interviewed her. *Id.* at 146, 148; Pl. App. at 413. As part of the interview, Martin and Powell discussed Martin's work schedule and agreed that her hours would be 8:00 a.m. to 4:00 p.m. with a thirty-minute lunch. Pl. App. at 384 (e-mail from Powell to Quest that Martin's hours would be 8:00 a.m. to 4:00 p.m.); *id.* at 473 (e-mail from Martin prior to being hired confirming that her hours would be 8:00 a.m. to 4:00 p.m.).[4]

Quest paid Martin's salary, provided her benefits and withheld appropriate taxes. Def. SJ App. at 24, 25-26, 28. Martin understood she was an at-will employee of Quest and signed a contract with Quest which included a stipulation that she was not an employee of any facility, but was an independent contractor through Quest. *Id.* at 31, 48. Only Quest had the authority to change her wages. *Id.* at 26. If a facility cancelled Martin's contract, Martin would remain a Quest

[4]Much time is spent by the parties arguing whether Plaintiff's hours were 8:00 a.m. to 4:00 p.m. with a thirty-minute lunch (Plaintiff's view), or 7:30 a.m. to 4:00 p.m. (Defendant's view). As set forth in the next section (*see* infra at Sec. II), when ruling on a motion for summary judgment, the court must view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Under this standard, sufficient evidence of record exists to create a genuine issue of material fact that Martin's hours were 8:00 am. to 4:00 p.m. with a thirty-minute lunch break. *See* Pl. App. at 384 (May 1, 2006 e-mail from Martin's supervisor Rita Powell to Quest that Martin's hours were 8:00 to 4:00 with a thirty-minute lunch); *id.* at 473 (May 2, 2006 e-mail from Martin to Quest confirming that her hours would be 8:00 to 4:00). Moreover, the court has reviewed Rita Powell's deposition transcript wherein, after Plaintiff's counsel showed her the May 1, 2006 e-mail she sent to Quest reflecting the 8:00 a.m. start time, Powell agrees that a document she created calculating the number of Martin's absences needed to be reworked based on a starting time of 8:00 a.m. rather than 7:30 a.m. *See id.* at 394, pg. 45:5-18.

Plaintiff has submitted affidavit evidence in opposition to Defendant's summary judgment motion that her hours were 8:00 a.m. to 4:00 p.m., and that her prior deposition testimony that she began work at 7:30 a.m. was wrong, and that she realized the error after reviewing her May 2, 2006 e-mail. *See* Ex. 8 to Pl. Opp'n Brief at ¶¶ 1-2. Defendant has filed a motion to strike paragraphs one and two of Martin's affidavit as contradicting her prior deposition testimony. Defendant's motion would be well-taken if the only evidence that Martin's schedule was 8:00 a.m. to 4:00 p.m. was her recently filed affidavit, which does not square with her deposition testimony. *See Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984) ("nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony."). Such is not the case here. Rather, summary judgment evidence independent of Martin's affidavit exists, and raises a fact issue for the jury to decide whether her hours were, in fact, 8:00 a.m. to 4:00 p.m. Under these circumstances, any contradiction would go to Martin's credibility and be an issue for the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment). As the court has not had need to consider Plaintiff's affidavit testimony regarding her work schedule, Defendant's motion to strike paragraphs 1 and 2 of Martin's affidavit are **denied as moot**.

employee.  *Id.*  Quest was responsible for ensuring that Martin had the necessary training certifications for her job.  *Id.* at 24.  Quest participated in the negotiation of Martin's hours.  *Id.* at 26.

Powell directly supervised Martin, gave Martin her daily assignments and set her work hours.  Pl. App. at 355, 384, 469-70.  After she began working at the clinic, UT Southwestern, not Quest, reassigned her from "triage" to administering chemotherapy in the infusion room.  *Id.* at 418-22, 470.  All equipment and training she needed to perform her daily duties were provided by UT Southwestern, not Quest.  *Id.* at 468.

On Friday, July 14, 2006, Martin was scheduled for computer training with Thomas Dillon. Def. App. at 59.  During the training, Dillon made sexual remarks and touched Martin.  Martin testified at her deposition and in her written statement as follows:

- He asked whether she was married or had a boyfriend;

- He stared at her, asking if anyone had ever told her "you have a beautiful smile" and that she did, and "wow, your profile . . . and a very kissable mouth";

- He started panting like a dog, saying "Oh, I better quit";

- He placed his hand on hers saying "I just wanted to touch your hand";

- He followed behind her, asking her how she kept such a nice figure; and

- He discussed sexual relations with his wife.

Pl. App. at 435-442, 474-75; Def. App. At 60-61, 118-19.  She complained of the incident to Powell that same afternoon.  Pl. App. at 451, 453.  Dillon's behavior made her uncomfortable, but she was able to return to her job responsibilities that same day after the incident.  Def. App. at 63, 65.  After Martin reported the incident to Powell, Powell asked UT Southwestern's Deborah Fleming

4

("Fleming") to join the meeting. Pl. App. at 392-93. Plaintiff provided a written statement and was advised of Defendant's policy for reporting harassment. *Id.* at 393. Fleming contacted Vernon Mullen ("Mullen"), the assistant vice president of the Office of Equal Employment and Minority Affairs, regarding the incident. *Id.* at 356-57, 362, 365.

The following work day, Monday, July 17, 2006, by 9:34 a.m., Rita Powell called Quest and demanded Martin be replaced. *Id.* at 312-314. On Wednesday, July 19, 2006, Fleming called Quest to demand a replacement nurse. *Id.* at 313. UT Southwestern terminated Martin's contract later that day. Def. App. at 150. In December 2006, Dillon "repeated his behavior with two newly hired nurses" and subsequently resigned. Pl. Opp'n Brief at 6 (citing Def. App. at 165-72). In June 2005, Dillon had been counseled twice for offensive and inappropriate jokes. *See* Def. App. at 171, 184.

On October 8, 2006, Martin filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Pl. App. at 244. In response, Mullen submitted a statement on behalf of UT Southwestern in which he "denied that Lori Martin was terminated because she complained of improper conduct by a UT Southwestern employee[.]" *Id.* at 371. According to Mullen in his statement to the EEOC:

> Lori was hired as a temporary employee for a specified period of time to fill a vacancy created when a triage nurse left our employ. Lori's assignment was slated for a period of seven weeks, but lasted two weeks longer than expected. When the need for her services ended, her assignment ended. Because of the resignation of two doctors and a decline in patient load at the Simmons Cancer Center, that position has remained open since July 2006 and is not expected to be filled until business needs change.
>
> After hearing that her assignment was ending, Lori complained of inappropriate conduct by an employee she believed to be a management official. The employee, Thomas Dillon, was not a management official, but a trainer in the Information Technology Department [. . .] The decision to end Lori's temporary employment was made well in advance of Lori's claim of inappropriate conduct by Thomas Dillon. The Quest Group, the temporary agency that employed Lori, was notified weeks in advance of Lori's claims [and] that Rita Powell, Nurse Supervisor,

wished to replace Lori. The Quest Group was notified in advance [that Lori's assignment] was to last for a period of seven weeks. Lori worked a total of nine weeks.

*Id.* at 371-72.

During her employment at UT Southwestern, Martin was never told that her performance was unsatisfactory. Pl. App. at 470, ¶ 7. Although Powell testified at deposition that she was concerned by Martin's pattern of absenteeism and tardiness, and called Quest to complain on multiple occasions before July 14, 2006, and to determine if she could terminate Martin's contract (*see* Def. App. at 130-32), other than Powell's testimony, and Fleming's testimony that she was present during one of the telephone calls from Powell to Quest (*see* Pl. App. at 355), there is no other evidence that these calls occurred. Neil Brady, President and Chief Executive Officer of Quest, when asked at his deposition whether "he ever reach[ed] a conclusion whether the phone calls at least had been made," testified to his personal conclusion that "[i]n looking at [Quest's] telephone records, there were no phone calls during the time we were supposedly getting them prior to [July] 17th[.]" *Id.* at 275-76.[5] UT Southwestern has produced no documentation reflecting its dissatisfaction with Martin's performance or her attendance that is dated before she reported Dillon's sexual harassment to Powell. *Id.* at 354, 355, 369, 393. Although Fleming and Mullen

---

[5]Although Defendant has filed a motion to strike the Quest telephone records attached to Brady's deposition (as well as notes on the records) as unauthenticated and hearsay, Defendant provides the court with no argument as to the inadmissibility of Brady's deposition testimony regarding his personal conclusions from looking at the telephone records. Moreover, although Defendant generally asks the court to strike all of Exhibit 3 (which includes the deposition transcript and the telephone logs) (*see* Def. Mot. to Strike at 1), Defendant only asserts evidentiary objections to pages 280 through 334 of Plaintiff's Appendix, which do not include Brady's deposition testimony. *See* Def. Mot. to Strike at 2. As no grounds have been provided to strike Brady's testimony, the court deems it admissible at this time. Finally, as the court has not had need to rely on any evidence in pages 280 through 334 of Plaintiff's Appendix in reaching its decision herein, the court **denies as moot** Defendant's Motion to Strike this evidence.

testified at deposition that UT Southwestern's policy was to document any counseling of an employee (*see id.* at 355, 369), no documentation was made regarding counseling Martin.[6]

At some point during the course of her employment, Powell asked Martin if she would be interested in extending her contract, or taking a regular full-time position with UT Southwestern. Def. App. at 133; Pl. App. at 433-34, 454-47.

## II.      Summary Judgment Standard

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Id.*  When ruling on a motion for summary judgment, the court must view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Ragas*, 136 F.3d at 458. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.  As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied.  *Anderson*, 477 U.S. at 250.

---

[6]Mullen and Fleming's belief that this policy may not have applied to temporary employees such as Martin is a question of fact for the jury.

Once the movant has made this initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Conclusory allegations are not competent summary judgment evidence, and are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports her claim. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III. Analysis

### A. Whether UT Southwestern was Martin's Employer

As its first basis for summary judgment, UT Southwestern contends that Quest, not UT Southwestern, was Martin's "employer" for purposes of Title VII and the TCHRA.[7] *See* Def. SJ Brief at 7-9; Def. Reply at 1. A prerequisite to a lawsuit under Title VII is an employment relationship between the plaintiff and the defendant. *Deal v. State Farm County Mut. Ins. Co. of*

---

[7]The TCHRA "is modeled after federal civil rights law." *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). An express purpose of the TCHRA is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." *Id.* (quoting Tex. Lab. Code § 21.001(1)). The TCHRA "purports to correlate 'state law with federal law in the area of discrimination in employment.'" *Id.* The evidentiary framework for stating a claim under the TCHRA is the same as that employed under Title VII. *Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex.App.–Houston [1st Dist.] 1993, writ denied); *Martin v. Kroger Co.*, 65 F. Supp.2d 516, 530 (S.D. Tex. 1999). The court thus applies the same analysis on the TCHRA and Title VII claims.

*Texas*, 5 F.3d 117, 118 n.2 (5th Cir. 1993). [8] To determine whether an entity is an "employer" under

Title VII, Fifth Circuit courts apply the "hybrid economic realities/common law control test." *Deal*,

5 F.3d at 118-19; *Mares v. Marsh*, 777 F.2d 1066, 1067 (5th Cir. 1985). The control component

measures whether the alleged employer has the right: (1) to hire and fire the employee; (2) to

supervise the employee; and (3) to set the employee's work schedule. *Deal*, 5 F.3d at 119. The

"economic realities" component focuses on whether the alleged employer: (1) paid the employee's

salary; (2) withheld appropriate taxes; (3) provided benefits; and (4) set the terms and conditions of

employment. *Id.* As between the two components, "the right to control an employee's conduct is

the most important component[.]" *Id.*

Summary judgment evidence submitted by UT Southwestern shows that Quest paid Martin's

salary, provided her benefits and withheld appropriate taxes. Def. SJ App. at 24, 25-26, 28. Martin

understood she was an at-will employee of Quest and signed a contract with Quest which included

a stipulation that she was not an employee of any facility, but was an independent contractor through

Quest. *Id.* at 31, 48. Only Quest had the authority to change her wages. *Id.* at 26. If a facility

cancelled Martin's contract, Martin would remain a Quest employee. *Id.* Quest was responsible for

ensuring that Martin had the necessary training certifications for her job. *Id.* at 24. Quest

participated in the negotiation of Martin's hours. *Id.* at 26. Neil Brady testified at his deposition

that, although a nurse's hours would be pre-arranged between Quest and the facility, "it can change

depending on staffing needs." *Id.* He further testified that generally the facility would need to get

---

[8]To qualify as a Title VII "employer," a defendant must first fall within the statutory definition of "a person engaged in an industry affecting interstate commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person[.]" 42 U.S.C. § 2000e(b). UT Southwestern does not challenge that it falls within the statutory definition.

Quest approval for these changes. *Id.* As to job assignments and tasks, Neil Brady testified as follows:

> Q. When a . . . per diem contract is entered into with the facility, in the contract is the nurse given her assignment? Do they know what their job is going to be generally?
>
> A. Yes.
>
> Q. So they'll be given a specific task to handle within that assignment for that day or for that 13-week period?
>
> A. Yes, generally.
>
> Q. Generally. Could there be a situation where the facility [. . .] during the contract changed their responsibilities under the [. . .] contract or would the nurse be limited to that, what they were contracted to do?
>
> A. There could be a change depending on the nurse qualifications and the overall facility agreement which might specify that nurses are required – usually the language is something on the order of nurses are required to float within their area of expertise and specialty. So it is possible that they could be requested but certainly not forced to move into another area.
>
> Q. Okay. So generally when a nurse goes into a facility, they know what they're going to be doing and what their role is?
>
> A. Yes.

*Id.*

Martin does not specifically dispute this evidence, but contends that summary judgment should be denied, since UT Southwestern supervised her and controlled her daily activities. Pl. Opp. Brief at 9-13. She further contends that "Defendant offers almost no evidence on the issue of control, the crucial factor in determining Plaintiff's status." *Id.* at 10 (quoting *Deal*, 5 F.3d at 119) ("[T]he right to control an employee's conduct is the most important component of [the hybrid economic realities/common law control] test.")). In support, Martin presents evidence that her day-to-day activities were supervised by UT Southwestern employees, not Quest. Specifically, evidence shows that Powell supervised Martin and gave Martin her daily assignments. Pl. App. at 355.

Plaintiff has also submitted evidence that Powell set Martin's daily work hours. *Id.* at 384 (email from Powell of UT Southwestern to Flo Williams at Quest). Martin has submitted evidence that during the course of her contract, UT Southwestern, not Quest, reassigned her from "triage" to administering chemotherapy in the infusion room. *Id.* at 418-22, 470. She has also submitted a declaration wherein she testifies that Rita Powell was her "immediate supervisor," and that UT Southwestern, and not Quest, directed her day-to-day activities in the oncology clinic. *Id.* at 469-70. The evidence also shows that all equipment and training she needed to perform her daily duties were provided by UT Southwestern, not Quest. *Id.* at 468.

UT Southwestern relies on unpublished cases from other district courts, which are of no precedential value, in support of its argument that Quest, not UT Southwestern, was Martin's employer for purposes of Title VII. *See* Def. MSJ Brief at 8-9. Defendant relies heavily on *Mayes v. Kelly Services, Inc.*, 2004 WL 533951 (N.D. Tex. Feb 11, 2004) (McBryde, J.). *See id.* In *Mayes*, a case involving a temporary staffing agency, the court held that the temporary staffing agency (Kelly Services), and not OnStar (where Mayes was placed), was Mayes's employer under Title VII, and granted summary judgment in favor of OnStar which claimed it was not a Title VII "employer." *Mayes*, 2004 WL 533951, at *3. The evidence in that case showed that Kelly Services, like Quest, provided plaintiff's salary, withheld taxes, provided benefits and set certain of the terms and conditions of employment. *Id.* As in this case, when Mayes's assignment with OnStar ended, he was still employed by Kelly Services, which could assign him to a different workplace. *See id.*

The court has reviewed *Mayes* and finds it instructive, although not in the manner urged by Defendant. A critical distinction between *Mayes* and this case is the summary judgment evidence submitted by Martin (*see supra*) showing that UT Southwestern employees trained and supervised

her in her day-to-day activities, set her hours, and even transferred her from triage to chemotherapy infusion. By contrast, in *Mayes*, the court emphasized that plaintiff failed "to cite to any specific summary judgment evidence in opposing" defendant's motion. *See id.* at *3, n.1. Further, Defendant's own evidence shows that UT Southwestern was able to exercise some level of control over an employee under contract from Quest. In responding to questions concerning changes to schedules and job assignments, Neil Brady testified that, while a nurse going to a facility would know generally what her job was, "[t]here could be a change depending on the nurse qualifications and the overall facility agreement which might specify that nurses are required – usually the language is something on the order of nurses are required to float within their area of expertise and specialty. So it is possible that they could be requested but certainly not forced to move into another area." Def. App. at 26.

In short, based on the evidence presented, and drawing all inferences from the factual record in the light most favorable to the nonmoving part, *see Matsushita*, 475 U.S. at 587, fact issues remain as to whether UT Southwestern could be considered Martin's employer for Title VII purposes. *See, e.g., Edwards v. Galveston-Tex. City Pilots*, 203 F.Supp.2d 759, 762 n.1 (S.D. Tex. 2002) (rejecting defendant's claim that plaintiff was not its employee where "Plaintiff produce[d] at least some evidence showing that Defendant control[led] the [Plaintiff's] daily work functions, which is the most crucial factor is assessing the existence of an employment relationship."); *cf. Hathcock v. ACME Truck Lines, Inc.*, 262 F.3d 522, 527 (5th Cir. 2001) ("Generally, the worker-status inquiry is fact intensive, and presumption weighs in favor of submission of such inquiries to the jury"). In light of the foregoing, the court rejects UT Southwestern's argument that it was not

Martin's "employer" for purposes of Title VII. Accordingly, Defendant's motion for summary judgment on this ground is **denied**.

### B. Plaintiff's Sexual Harassment Claim

Martin has asserted a claim for sexual harassment. After setting forth the applicable legal standard, the court will consider Defendant's arguments in support of its summary judgment motion.

#### 1. Legal Standard

Title VII of the Civil Right Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As the United States Supreme Court has recognized, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (internal quotations and citation omitted). An employer violates Title VII when the employer allows the workplace to be "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). The Court in *Harris* further noted that "[t]his standard . . . takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.*

A plaintiff may prove her sexual harassment claim either by establishing that a tangible employment action was taken against her because of her sex or by establishing that a supervisor with

immediate or successively higher authority discriminated against her because of her sex and created a hostile or abusive environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 786-87 (1998); *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002)*; Casiano v. AT&T Corp.*, 213 F.3d 278, 283-84 (5th Cir. 2000). In addition, a plaintiff may prove her sexual harassment claim by establishing that a coworker or third party discriminated against her because of her sex and created a hostile or abusive environment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998) (explaining various theories of liability for unlawful workplace harassment). Plaintiff does not allege a tangible employment action, but rather that Thomas Dillon's conduct on July 14, 2006 created a hostile work environment.

To establish a sexual harassment claim based on hostile work environment, the employee must show: (1) that she belongs to a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999); *Pfeil v. Intercom Telecomm.*, 90 F.Supp.2d 742, 748 (N.D. Tex. 2000). In *Faragher* and *Ellerth*, the Supreme Court modified this test with respect to cases where the alleged harasser is a supervisor with immediate or higher authority over the harassed employee. *Watts*, 170 F.3d at 509; *Pfeil*, 90 F.Supp.2d at 748. In such cases, the employee need only meet the first four elements of the test.

A "term, condition, or privilege" of employment is affected when the harassing conduct is severe or pervasive enough to create an objectively hostile or abusive working environment. *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir. 1999); *Pfeil*, 90 F.Supp.2d

at 749. If the conduct at issue was not severe or pervasive, the employer cannot be held liable. *Wyatt*, 297 F.3d at 409. If, however, the conduct was severe or pervasive, the employer may avail itself of the *Ellerth/Faragher* affirmative defense in an attempt to avoid liability. *Wyatt*, 297 F.3d at 409; *Pfeil*, 90 F.Supp.2d at 749. This defense is comprised of two elements, both of which an employer must establish to avoid liability under Title VII: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any available preventive or corrective opportunities. *Ellerth*, 524 U.S. at 765; *Wyatt*, 297 F.3d at 409.

Courts determine whether an environment is sufficiently abusive to be actionable under Title VII by reviewing all of the relevant circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Butler*, 161 F.3d at 269 (citing *Faragher*, 524 U.S. at 787-88). Incidental or occasional sexual comments, discourtesy, rudeness, or isolated incidents (unless extremely serious) are not discriminatory changes in the terms and conditions of a worker's employment. *Id.*

Even when a hostile environment is shown, the plaintiff must establish that the workplace environment had the effect of altering the terms and conditions of her employment. *Harris*, 510 U.S. at 21; *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir. 1993). Central to the court's inquiry into a hostile environment claim is whether the alleged harasser's actions have undermined the victim's workplace competence, discouraged her from remaining on the job, or kept her from advancing in her career. *Harris*, 510 U.S. at 22; *Shepherd*, 168 F.3d at 874. Title VII is intended only to prohibit and prevent conduct "that is so severe [or] pervasive that it destroys a protected

class member's opportunity to succeed in the workplace." *Shepherd*, 168 F.3d at 874. Title VII's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends, but does not hinder an employee's performance. *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996). To be actionable, the challenged conduct must be objectively offensive, meaning that a reasonable person would find the conduct hostile or abusive, and subjectively offensive, meaning that the victim perceived the conduct to be hostile or abusive. *See Harris*, 510 U.S. at 21-22.

### 2. Discussion

UT Southwestern has moved for summary judgment on Plaintiff's hostile work environment sexual harassment claims. In support, UT Southwestern contends that summary judgment should be granted since: (i) the alleged harassment was "neither severe nor pervasive enough to affect a term, condition, or privilege of employment" (Def. MSJ Brief at 13), and (ii) Plaintiff unreasonably failed to take advantage of UT Southwestern's corrective remedies under its sexual harassment policy. *See* Def. Reply at 8-9.

The evidence, viewed in the light most favorable to Plaintiff, shows that on Friday, July 14, 2006, Martin was scheduled for one-on-one computer training with Dillon. During the training, Dillon made sexual remarks and touched Martin's hand. Martin testified at her deposition and in her written statement as follows:

- He asked whether she was married or had a boyfriend;

- He stared at her, asking if anyone had ever told her "you have a beautiful smile" and that she did, and "wow, your profile . . . and a very kissable mouth";

- He started panting like a dog, saying "Oh, I better quit";

- He placed his hand on hers saying "I just wanted to touch your hand";

- He followed behind her, asking her how she kept such a nice figure; and

- He discussed sexual relations with his wife.

Pl. App. at 435-442, 474-75. She complained of the incident that same afternoon to Powell. *Id.* at 451, 453. Plaintiff testified at her deposition that his behavior made her uncomfortable, but that she was able to return to her job responsibilities that same day after the incident. Def. App. at 63, 65. On July 17, 2006, Powell asked Quest to send a replacement nurse for Martin. Pl. App. at 314. On July 19, 2006, UT Southwestern terminated Martin's contract. Def. SJ App. at 150. In December 2006, Dillon "repeated his behavior with two newly hired nurses" and subsequently resigned. Pl. Opp'n Brief at 6 (citing Def. App. at 165-72). In June 2005, Dillon had been counseled twice for offensive and inappropriate jokes. *See* Def. App. at 171, 184.

In support of its motion for summary judgment, Defendant contends that "the alleged harassment Martin experienced was neither severe nor pervasive enough to affect a term, condition, or privilege of her employment. Dillon's actions occurred during a two-hour period, [and] nothing he said was physically threatening but was, rather, boorish and inappropriate." Def. MSJ Brief at 13.

Having reviewed all of the relevant circumstances, including the frequency of the conduct, its severity, whether the conduct was physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interfered with Martin's work performance (*see Butler*, 161 F.3d at 269) (citing *Faragher*, 524 U.S. at 787-88), the court determines that under applicable law, Martin has failed to raise a genuine issue of material fact that the alleged sexual harassment of which she complains was "sufficiently severe or pervasive to alter the conditions of

[her] employment and create an abusive working environment[.]*" See Harris,* 510 U.S. at 21 (internal quotations and citations omitted).  Otherwise stated, given the evidence, no reasonable juror could conclude that the single instance of sexually harassing conduct of which Plaintiff complains was  severe or pervasive enough to create an objectively hostile or abusive working environment. *See Shepherd*, 168 F.3d at 874; *Pfeil*, 90 F.Supp.2d at 749.  In *Shepherd*, 168 F.3d at 874, cited by Defendant in support of its motion for summary judgment (*see* Def. MSJ Brief at 12), with facts much more egregious than those present in this case, the Fifth Circuit held that a coworker's behavior was not sufficiently severe or frequent to support a hostile work environment claim.[9]  In opposition to Defendant's motion, other than generally reciting the law pertaining to sexual harassment and reiterating her allegations regarding the incident, Plaintiff fails to cite any cases in support of her argument that she has raised a genuine issue of material fact that she was subjected to a hostile work environment.  She also fails to distinguish cases cited by Defendant where summary judgment was granted in favor of the employer on much more egregious facts than those herein.

Further, in determining whether an environment is sufficiently abusive to be actionable under Title VII, one of the factors courts consider is whether the alleged offensive conduct unreasonably interfered with the employee's work performance.  *See Butler*, 161 F.3d at 269 (citing *Faragher*, 524 U.S. at 787-88).  In this case, Martin has failed to submit evidence that the alleged conduct unreasonably interfered with her work performance. The evidence shows that although she was

---

[9]In *Sheperd*, plaintiff's coworker made a number of sexually offensive comments over the years involving plaintiff's nipples and thighs, as well as physical contact with the plaintiff's arms and shoulders.  The Fifth Circuit concluded that "based upon a consideration of all the circumstances, [the harasser's] conduct did not render [the plaintiff's] work environment objectively 'hostile' or 'abusive.'"168 F.3d at 874.

extremely upset and telephoned her mother, she was able to resume her job responsibilities that day. *See* Def. App. at 63, 65.

While the court certainly does not condone Dillon's conduct, the court remains mindful that Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). Dillon's actions on this one occasion, however objectionable and loathsome, simply are not severe or pervasive enough to fall within Title VII's purview, as it has been interpreted by the courts. In short, the court determines that UT Southwestern is entitled to summary judgment on Martin's sexual harassment claims since she has failed to create a genuine issue of material fact that the single instance of sexual harassment of which she complains was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment[.]" *See Harris*, 510 U.S. at 21.[10] Accordingly, the court **grants** Defendant's motion for summary judgment as to Plaintiff's sexual harassment claims.

## C. Retaliation

Martin claims that UT Southwestern, by cancelling her contract, retaliated against her for reporting Dillon's sexually harassing behavior to her supervisor, all in violation of Title VII. After considering the applicable legal standard, the court will address Defendant's arguments in support of its summary judgment motion.

### 1. Legal Standard

Under Title VII, a plaintiff can prove a claim of retaliation by either direct or circumstantial evidence. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *see generally*

---

[10]In light of the court's decision, the court need not reach Defendant's alternate argument that it is entitled to summary judgment on Plaintiff's sexual harassment claim because Plaintiff unreasonably failed to take advantage of UT Southwestern's corrective remedies under its sexual harassment policy. *See* Def. Reply at 8-9.

*Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Cases built on circumstantial evidence, like this one, are analyzed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, a Title VII plaintiff must first establish a *prima facie* case of retaliation by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802-04; *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002). To prove a *prima facie* case of retaliation, the plaintiff must establish that: (1) she participated in activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Septimus*, 399 F.3d at 609 (and cases cited therein). Once this *prima facie* case has been established, there is a presumption of discrimination, and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802-04; *Gee*, 289 F.3d at 345. The employer's burden is one of production, not persuasion, and involves no credibility determinations. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981). If such a showing is made, the burden shifts back to the plaintiff to "prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." *Gee*, 289 F.3d at 345 (the "pretext alternative"). "At the summary judgment stage, the movant need only point to the existence of a genuine issue of material fact." *Id.*

A plaintiff may establish pretext "by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 143 (2000)). Otherwise stated, a "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation."

*Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and may therefore be enough to prevent summary judgment or judgment as a matter of law. *See Reeves*, 530 U.S. at 148. As set forth in *Reeves*: "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." 530 U.S. at 147 (internal quotation marks and citations omitted); *Gee*, 289 F.3d at 348 (applying *Reeves* to Title VII retaliation claim and stating that "a factfinder may infer the ultimate fact of retaliation from the falsity of the explanation.").

### 2. Discussion

UT Southwestern concedes that Plaintiff has established her *prima facie* case of retaliation. UT Southwestern contends that it is entitled to summary judgment motion on Plaintiff's retaliation claims since she has not raised a genuine issue of material fact that UT Southwestern's legitimate, nondiscriminatory reason for terminating her employment contract was a pretext for retaliation. UT Southwestern maintains that "Martin's contract was terminated based on her history of excessive tardiness, unreported absenteeism, and other performance deficiencies." Def. MSJ Brief at 19.

In opposition to Defendant's motion, Martin contends that she has raised "genuine issues of material fact whether [Defendant's] alleged reasons are a pretext or whether retaliation was a motivating factor, that Defendant had 'mixed motives' in terminating Lori Martin." Pl. Opp'n Brief at 18. Plaintiff is seeking to rely on the *McDonnell Douglas* pretext alternative (namely, that Defendant's reason is not true, but is instead a pretext for discrimination), and alternatively, the so-

called "modified *McDonnell Douglas* approach," or "mixed motive alternative" (namely, that Defendant's reason, while true, is only one of the reasons for its conduct, and the other "motivating factor" is her protected conduct). *See id.* (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)). Defendant argues that the "mixed-motive" alternative is not available to Plaintiff because "the Fifth Circuit has not extended the mixed-motive analysis to Title VII retaliation claims." Def. Reply at 3 n.2 (and cases cited therein).[11] While it is true that the Fifth Circuit has no published decision extending the "mixed motive" alternative to retaliation cases, the court agrees with the well-reasoned decision recently issued by United States District Judge David C. Godbey, who, after painstakingly reviewing the relevant statutory language and Supreme Court and Fifth Circuit precedent, held that "a mixed motive theory can apply in Title VII retaliation claims[.]" *See Smith v. Xerox Corp.*, __ F.Supp.2d __, 2008 WL 4768000, at *6 (N.D. Tex. Oct. 31, 2008) (Godbey, J.) (and cases cited therein).[12]

### a.    The Parties' Contentions concerning Pretext

In response to Defendant's argument that Plaintiff has failed to raise a genuine issue of material fact that its proffered legitimate, nondiscriminatory reason for cancelling her contract was merely a pretext for retaliation, Plaintiff points to the following summary judgment evidence: (1)

---

[11]Defendant ignores limiting language in cases it relies upon to support its argument that Plaintiff cannot rely on the mixed motive alternative. For instance, Defendant relies on *McCullough v. Houston County, Tex.*, 2008 WL 4613697, at *7 n.7 (5th Cir. Oct. 16, 2008) (*see* Def. Reply at 3 n.2), wherein the court, after noting that it had not yet extended the mixed motive analysis to retaliation cases, stated: "This is particularly true where, as is the case here, neither party raises the issue, both parties argue pretext, and both parties engage in a but-for analysis." *McCullough*, 2008 WL 4613697, at *7 n.7. Similarly, in *Septimus*, 399 F.3d at 607 & n.7, cited by Defendant (*see* Def. Reply at 3 n.2), the court stated it did not need to consider whether to extend the mixed motive alternative to retaliation cases since, "[t]he parties agree that this case was litigated and tried as a 'pretext,' (rather than 'mixed-motive') retaliation case."

[12]The Fifth Circuit has applied the mixed motive alternative to a Title VII retaliation case in an unpublished decision. *See Block v. Kelly Servs., Inc.*, 197 Fed. Appx. 346, 348-49 (5th Cir. 2006). The court is also cognizant that numerous other district courts in the Fifth Circuit have reached the same conclusion as Judge Godbey, that a mixed motive theory can apply in a Title VII retaliation case. *See Smith*, __ F.Supp.2d at __, 2008 WL 4768000, at *7 (and cases cited therein).

the immediate temporal proximity between Plaintiff's report of Dillon's sexual harassment and her termination; (2) the "inconsistent, false and questionable reasons" for Martin's termination provided by Mullen to the EEOC, and the fact that Defendant has abandoned certain of Mullen's arguments to the EEOC; (3) the lack of evidence to support Powell's testimony that she telephoned Quest several times before July 17, 2006, to complain about Martin, as well as summary judgment evidence to the contrary; (4) Martin's own testimony that she was not made aware that Defendant found her performance unsatisfactory, that Powell never warned or counseled her about her attendance or performance and had even suggested at some point that Martin stay on long-term; (5) Powell's and Fleming's admissions that they never documented any counseling or gave any written warnings (despite UT Southwestern's policy to do so); and (6) the fact that UT Southwestern scheduled Martin for a two-hour one-on-one training session when it claims it had already decided to terminate her contract.

In its reply brief, Defendant argues that, even if Martin's work day started at 8:00 a.m., not 7:30 a.m., she was still late on nine occasions and "[n]o reasonable jury would reject the assertion that Martin's regular tardiness and absences were not part of the reason her contract was cancelled[,]" that its EEOC position statement and its summary judgment motion are consistent regarding why Martin was terminated, and finally that the court should reject all of Martin's testimony due to certain inconsistencies. *See* Def. Reply at 2-7.

### b.    Discussion

The court now turns to the summary judgment record.  First, Defendant places great weight on Powell's and Fleming's deposition testimony that Powell called Quest numerous times before July 17, 2006 (the first business day after Martin reported Dillon's conduct), to complain about Martin's pattern of absenteeism and tardiness, and to determine if she could terminate Martin's

contract (*see* Def. App. at 130-32). Viewing the evidence in the light most favorable to Plaintiff, however, a reasonable juror could well conclude that Powell did not call Quest until July 17, 2006, which is *after* Martin reported Dillon's conduct. Specifically, Neil Brady, President and Chief Executive Officer of Quest, when asked at his deposition whether "he ever reach[ed] a conclusion whether the phone calls at least had been made," testified to his personal conclusion that "[i]n looking at [Quest's] telephone records, there were no phone calls during the time we were supposedly getting them prior to [July] 17[th][.]" *Id.* at 275-76.

Further, Mullen's written statement to the EEOC regarding Defendant's reasons for terminating Martin's contract are unsupportable in light of record evidence, and therefore of questionable validity. Mullen stated that: "Lori's assignment was slated for a period of seven weeks, but lasted two weeks longer than expected. When the need for her services ended, her assignment ended. Because of the resignation of two doctors and a decline in patient load at the Simmons Cancer Center, that position has remained open since July 2006 and is not expected to be filled until business needs change." Pl. App. at 371-72. The evidence shows that Martin's contract was slated to last for twelve or thirteen-weeks, not seven. Def. App. at 148 (April 25, 2006 e-mail from UT Southwestern's oncology clinic manager, Tom Parker, to Quest). Additionally, the evidence shows that on July 17, 2008, Powell called Quest to request that Martin be replaced, and on July 19, 2006, Fleming similarly requested a replacement nurse. Pl. App. at 312-13. That Powell and Fleming sought a replacement nurse renders questionable the veracity of Mullen's statement to the EEOC that UT Southwestern cancelled Martin's contract because the need for her nursing services had ended. Mullen also stated to the EEOC that: "The decision to end Lori's temporary employment was made well in advance of Lori's claim of inappropriate conduct by Thomas Dillon." *Id.* at 371-72. Were the decision already made to terminate Martin prior to July 14, 2006, when she

reported Dillon's misconduct, as UT Southwestern contends, why would UT Southwestern have Martin spend two-hours training one-on-one on a new computer system? At a minimum, a jury could draw the inference that UT Southwestern would not invest in training for a nurse from a temporary staffing agency had it already made up its mind to terminate her contract. In that same vein, a jury could also take into account that Fleming and Powell conceded they never documented any counseling or gave any written warnings to Martin that her contract was about to be terminated due to her tardiness and absenteeism. Martin testifies that Powell never complained to her, or warned or counseled her about her performance or attendance. *Id.* at 470. According to Plaintiff, Powell even discussed with her extending her contract. *Id.* at 445-47. Resolving the conflicting testimony of Martin and Powell are, of course, the province of the jury. *See Reeves*, 530 U.S. at 150 (a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment).

Mullen states that: "The Quest Group, the temporary agency that employed Lori, was notified weeks in advance of Lori's claims [and] that Rita Powell, Nurse Supervisor, wished to replace Lori. The Quest Group was notified in advance [that Lori's assignment] was to last for a period of seven weeks. Lori worked a total of nine weeks." *Id.* at 371-72. As stated above, Neil Brady concluded that "[i]n looking at [Quest's] telephone records, there were no phone calls during the time we were supposedly getting them prior to [July] 17th[.]" *Id.* at 275-76. Also, as already stated, the evidence shows that Defendant informed Quest that Martin's contract was to last twelve to thirteen-weeks. Def. App. at 148. From these inconsistencies alone, a jury could infer that Defendant's articulated reason for cancelling Martin's contract is unworthy of credence. *See Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be

quite persuasive."); *Gee*, 289 F.3d at 347-48 (determining summary judgment was improper where plaintiff produced evidence that the employer's explanation for her non-selection had been inconsistent).

Although Fleming and Mullen testified at deposition that UT Southwestern's policy was to document any counseling of an employee (*see* Pl. App. at 355, 369), no documentation was made regarding counseling Martin. Evidence of an employer's failure to follow internal procedures may, along with other evidence, show pretext. *See Russell*, 235 F.3d at 224 (employer's failure to follow its own internal procedures prior to terminating employee, along with other evidence, creates a jury issue that employer's justification was a pretext for discrimination); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 and n. 29 (5th Cir. 2005) (defendant's failure to utilize its progressive discipline system, including a verbal warning and written warning, in case involving plaintiff's failure to perform duties, creates an inference of pretext of employer's explanation for discharge).

The court now examines the timing between Martin's report of Dillon's sexual harassment to Powell and her termination. Viewed in the light most favorable to Plaintiff, with regard to timing, the facts show that on Friday, July 14, 2006, Martin complained to Powell of Dillon's actions. The following work day, Monday, July 17, 2006, by 9:34 a.m., Powell called Quest and demanded Martin be replaced. Pl. App. at 312-314. On Wednesday, July 19, 2006, Fleming called Quest to demand a replacement nurse. *Id.* at 313. UT Southwestern terminated Martin's contract later that day. Def. App. at 150.

While it is true that "temporal proximity alone is insufficient to prove but for causation[,]" and that temporal proximity between the adverse employment action and the protected conduct is just "one of the elements in the entire calculation," (*see Strong v. University Health Care System, L.L.C.*, 482 F3d 802, 808 (5th Cir. 2007) (citation omitted), in this case the close temporal proximity

is combined with a record replete not only with Mullen's questionable explanations to the EEOC regarding why UT Southwestern cancelled Martin's contract, but also with the conflict between Powell's testimony that she telephoned Quest repeatedly about Martin's absenteeism, and Brady's deposition testimony from which a jury could infer that, in fact, Powell did not call Quest about Martin until July 17, 2006, after Martin reported Dillon's misconduct.

In short, viewing the evidence set forth above in the light most favorable to Plaintiff, a reasonable juror could conclude that UT Southwestern had no intention of terminating Martin, even assuming she had been absent or tardy on occasions, until she complained to Powell that Dillon had sexually harassed her during computer training. It follows that a reasonable factfinder could conclude that Defendant's asserted justification for cancelling Martin's contract is unworthy of credence and a pretext for unlawful retaliation. *See Sandstad*, 309 F.3d at 897 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). Finally, the court disagrees with Defendant's argument that "[n]o reasonable jury would reject the assertion that Martin's regular tardiness and absences were not (sic) part of the reason her contract was cancelled." Def. Reply at 3. In *Reeves*, the Supreme Court issued what the Fifth Circuit has characterized as a "mandate," "not to substitute [the court's] judgment for that of the jury and not to unduly restrict a plaintiff's circumstantial case of discrimination[.]" *See Russell*, 235 F.3d at 223 n.4. While the evidence shows Martin was absent and/or tardy on certain occasions, UT Southwestern's "evidence is not of such magnitude that a reasonable jury could *only* find in their favor." *Laxton*, 333 F.3d at 585-86 (quoting *Russell*, 235 F.3d at 225) (original emphasis). Because a jury could conclude that Defendant's proffered reason for terminating Martin's contract is false

and that retaliation was the real motive, the court **denies** Defendant's motion for summary judgment as to Plaintiff's retaliation claims.[13]

## IV.    Conclusion

For the foregoing reasons, the court **denies in part and grants in part** Defendant's Motion for Summary Judgment. Plaintiff has raised a genuine issue of material fact with respect to whether UT Southwestern was her employer under Title VII and the TCHRA. Accordingly, the court determines she has standing to sue UT Southwestern for employment discrimination, and **denies** Defendant's motion for summary judgment based on standing. Plaintiff has failed to raise a genuine issue of material fact with respect to her Title VII and TCHRA claims for sexual harassment based on hostile work environment. The court therefore **grants** Defendant's Motion for Summary Judgment as to these claims. Plaintiff's Title VII and TCHRA claims for sexual harassment based on hostile work environment are hereby **dismissed with prejudice**. Further, the court **grants** Defendant's motion for summary judgment as to Plaintiff's claim for punitive damages, given Plaintiff's concession that UT Southwestern has immunity from punitive damages. Plaintiff's claim for punitive damages is hereby **dismissed with prejudice**. Plaintiff has raised a genuine issue of material fact with respect to her retaliation claims under Title VII and the TCHRA. The court therefore **denies** Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claims. Finally, as the court did not consider any evidence to which Defendant objected in reaching its decision, the court **denies as moot** Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence. Plaintiff's Title VII and TCHRA retaliation claims remain for trial, which is currently

---

[13]Because the court determines that Plaintiff has raised a genuine issue of material fact as to whether Defendant's proffered legitimate nondiscriminatory reason for cancelling her contract was a pretext for retaliation, the court need not consider Plaintiff's argument that Defendant's justification, while true, is only one of the reasons for its conduct, and the other "motivating factor" is her protected conduct.

set for the court's four-week docket beginning February 2, 2009.  The court will set the pretrial conference by separate order.

        **It is so ordered** this 12th day of January, 2009.

_____
**Reed O'Connor**
**UNITED STATES DISTRICT JUDGE**